Pearson, C. J.
 

 The -fact that the witness, Marcissa, did aiot make known or complain of the outrage which had been perpetrated on her, for two weeks, was presented to the jury by his Honor, as a circumstance whieh affected her .credibility. This portion of the charge is excepted to, on the ground, that he ought to have gone further, and told the jury, that her not making an earlier disclosure, raised a
 
 presumption
 
 of falsehood, to be acted on by the jury in the absence of any proof to rebut it.
 

 It is net*»
 
 rule of law
 
 that silence, under such circumstances, raises a .presumption that the witness has sworn falsely. The passages in the books, to whieh reference was made on the argument, »use the word “ presumption,” not as a rule of law, but ¡a® inference of fact, and treat of
 
 silence,
 
 as a .circumstance tending strongly to impeach the credibility of the witness ; on the ground that .a forcible violation of her person so
 
 *22
 
 outrages the'female instinct, that a woman, not only will make an outcry for aid at the time,) but will instantly, and involuntarily, after its perpetration, seek some one to whom she can make known the injury and give vent to her feelings. The want of this demonstration of feeling or “ involuntary-outburst,” is treated of as a circumstance tending to show
 
 consent
 
 on her part; but it is no where held that this female instinct is so strong and unerring as to have been made- the foundation of a rule of law, as distinguished from a rule in respect to evidence, and the weight to which it is entitled : which is a matter for the jury. So that,, although we think his Honor would have been sustained by the authorities in presenting this circumstance to- the jury more forcibly than he did, still the omission is not an error in law which- this Court has the power to review..
 

 Tlie motion,'in arrest of judgment, cannot be sustained. It i's based upon the idea that the word “ person” in the statute, in respect to the crime of rape, Rev. Code, chap. 34, sec. 5, does not embrace a slave, and that the case of slaves is only provided for in
 
 the
 
 statute, Rev. Code, chap. 207, section 44, which- enacts,
 
 “
 
 Any slave or free negro, or free person of color, convieted by due course of law, of an assault with an intent to- commit a rape upon the body of a white female, shall suffer death.” If this position was- granted, the conclusion would not follow; for still, it would- seem, that a verdict finding a slave guilty of a rape upon the- body of a white female, would authorise a judgment; on the ground that a rape must of necessity include an assault with an intent to commit it; the greater includes the less.
 

 Bnt this Court is of opinion that the word “ person” in chapter 34, section 5, does embrace a slave. The word “ person” and the word “ man,” in their ordinary signification, include slaves, free negroes and free persons of color, as well' as- white men, and are to bo taken in that sense in construing statutes, unless there is something showing that it was not the intention of the law-makers to use these word's in their ordinary signification, and that it was not intended to. apply to slaves.
 
 *23
 
 It is said that the intention not to include slaves, in our statute, is to be inferred from the fact, that by the other, even assault with an intent, subjects the slave to the penalty of death, and it was a matter of supererogation to include him also in the former. This argument proves too much; for it excludes free negroes and free persons of color, as well as slaves, from the operation of the former statute, and it is a
 
 non sequitur,
 
 that the latter statute makes the former a matter of supererogation. It is clear the intention was to denounce the penalty of death against any person, no matter to which of the classes he belonged, who was guilty of rape, and in respect to. the last three classes, the intention was to go further, and to denounce the penalty of death against all who even committed an assault on a white female with an intent to ravish her.
 

 That it was the intention to include a slave by the word, “person,” in the 5th section, is manifest from the sections which immediately precede and follow it: section 4: “ if any person shall castrate, &c.:” section 7: “if any person shall burn the state-house, any court-house, &c.: section 8: “if any person shall enter any dwelling-house with intent, &c.,” “ he shall suffer death.” Can it be seriously contended that, as our statute law now stands, a slave may commit any and all of these deeds, without being guilty of a criminal offense ?
 

 The counsel for the prisoner rested his position, mainly, on the authority of
 
 Tom’s ease,
 
 Busbee’s Rep. 214. It is there decided that the word, “ person,” as used in the act of 1819, Rev. Code, chap. 34, sec. 60, forbidding any person passing counterfeit bank bills, did not embrace a slave. The decision is put on the authority of
 
 State v. Small,
 
 June Term, 1844. That was an indictment under the statute, Rev. Statutes, ch. 34, sec. 48, which provides that “ when
 
 any man
 
 shall take a woman into his house, or a
 
 woman
 
 a man,” “ and bod and cohabit together,” and it was held that from the subject matter, and from the punishment, to wit, a fine not exceeding $200, it was to be inferred that the law-makers did not use the words “ man” and “ woman” in their ordinary sense ; for if so, all of our slaves could be indicted, as none of them
 
 *24
 
 are married according to law, and there is no law by which they can be married, and the idea of intending to fine a slave was absurd; as slaves have no property.
 

 Torres case
 
 was governed by this authority, and it was conceived that the reasoning on which it was decided applied with full force, taken in connection with the sections wdiich 'immediately precede and follow it, providing against forgery •and making counterfeit bank bills, which slaves are not, usually, able to do, and in wdiich sections the same word, “person,” is used. From the two cases, this legal principle may be deduced: Where a statute uses the word “ man” or the word “ person” in creating an offense, it embraces slaves as ■well as white persons, and all others, unless from the nature ■of the subject matter and the punishment imposed, it appears not to have been the intention to embrace slaves. It is true, the Chief Justice wdio delivered the opinion, in arguing the question, uses the expression “in carrying out this humane policy the courts, in putting a construction upon penal statutes, •have adopted the principle that slaves are not embraced unless mentioned; they are not embraced for punishment, but they are for protection. This principle was declared by the •Court in the case of Small, June Term, 1844.” It is obvious -the learned Judge had in his mind the principle that, by our law, slaves are treated as “property,”
 
 eivüit&r,
 
 but are treated as persons
 
 criminaliler,
 
 and it was not his intention to lay dowm any rule of construction, other than that established by the case of
 
 State
 
 v. Small, and although his words may seem to go further, the correct principle is that stated above as deducible from the two cases.
 

 There is no error.
 

 Per Curiam,
 

 Judgment affirmed.